1-2-7-0-7 Anna Smeltz v. Marriott International Services Council, you may proceed May it please the Court, Counsel Pete Bobber, on behalf of Claimant Anna Smeltz, good afternoon, Your Honors. This matter is before you primarily on my request that you find that Claimant did meet her burden and proved she suffered odd-lot total permanent disability as a result of her 1989 work accident. The Commission decided otherwise, and as this Court knows and has addressed many of these odd-lot cases, Claimant bears the initial burden by a preponderance of the evidence that she either conducted a reasonable yet unsuccessful diligent job search or by proving that she is not employable in any well-known branch of the labor market. In the case at Barr, the Commission, unfortunately, never addressed the diligence of Claimant's job search. Nonetheless, the record indicates that she filled out approximately 75 job applications, she made over 100 job contacts, she contacted every employer listed in employers labor market survey, and from all those contacts she never received a job offer. Does she have a GED? She does not have a GED. Would that have been a reasonable requirement to have a GED? I mean, as it relates to being able to be employed in some type of a skill area consistent with what she was doing as a housekeeper? I agree, Your Honor, that that's a reasonable job requirement that employers can make. However, we have a somewhat uneducated individual with known cognitive deficits, as indicated on a neuropsychological examination, and at no time was any assistance offered her by Respondent, as we allege is their obligation under the Act, to provide vocational rehabilitation and assistance to obtain that GED or to suggest that she obtain the GED. As I understand, the Commission found that the Claimant, your client, had met her burden of showing she was permanently and totally disabled by presenting medical evidence. However, they went on to determine that Marriott had sufficiently rebutted, as I understand, the Claimant's prima facie case by presenting testimony in the report of Balmanti, the vocational rehabilitation counselor. So why couldn't they rely on Balmanti? Well, Your Honor, they could, but the way they stated their decision, I believe, is inconsistent in that, with all due respect, if I may back up, Your Honor, I think the Commission found the Claimant met her burden not through only medical testimony, but established through Pat Savis, the other vocational counselor, that she's not employable at this point in any well-known branch of the labor market based on her age, training, education, experience, and physical condition. Once they asserted that, then you're right. The burden shifts to the employer to prove that some kind of suitable work is regularly and continuously available to this Claimant. If you read the Commission's decision, the Commission never found that the employer met its burden to prove that suitable work is regularly and continuously available for this Claimant. In fact, if I may quote the Commission's decision, quote, Balmanti did not establish that a stable labor market exists for Petitioner or that Petitioner was employable, close quote. But then, as Your Honor correctly asserts, they go on to rely on Balmanti because Balmanti said in his report, in his testimony, this Petitioner would benefit if she would obtain her GED. And my response to that would be, she would probably also benefit if she obtained her doctorate degree. There's no evidence provided by Balmanti that she could obtain her GED. Balmanti himself testifies and indicates in his report that further testing is needed here. There's no evidence in the record that employer, remember whose burden it is now, employer ever attempted to obtain that testing. So the Commission, relying on Balmanti, saying that this Claimant would somehow, this Claimant who we just said there's been no stable labor market shown to exist for this Petitioner, that somehow she would be employable if she obtained her GED, absolutely amounts to speculation upon speculation. And as such, the Respondent and the employer here has not met their burden of proof. So as a matter of law, Your Honor, I think the Commission misapplied the law in that once the burden shifted to Respondent, they didn't make a clear finding that the employer met their burden, and in fact, as I quoted from their decision, they found that the Respondent did not because the only evidence they relied on was Balmanti, and they specifically stated that Balmanti did not establish that such a stable labor market exists. The second issue I'd like to bring before Your Honors was the Circuit Court's reversal of the Commission as to the award of penalties and attorney's fees. Obviously, for the Circuit Court or this Court to overturn the Commission's finding as to the penalties and fees, it would be a manifest wage standard. Unfortunately here, the Circuit Court never indicated that it applied such a standard when reversing the Commission's award of fees and penalties. And a brief look at the basis by which the Circuit Court reversed the Commission establishes that Justice Brennan misunderstood the Commission's rationale for awarding the penalties. The Commission awarded penalties and fees here because following Clayman's second work accident of July 20, 1999, employer never provided a reasonable basis for denial of the claim or payment of TTD benefits as is required by Commission rule. It never paid any TTD benefits after that second date of accident. So Justice Brennan opines that one of the mitigating factors for employer here was that they paid TTD benefits. Those TTD benefits were paid in connection with the first accident, and they were paid up until the time respondent obtained their first IME, who was Dr. Matz. That leads me to the second basis Justice Brennan relied on to reverse the Commission's award of penalties. She said that Dr. Matz gave employer a reasonable basis. But once again, Dr. Matz examined Clayman prior to date of accident number two, and the Commission based its award of penalties based on employer's behavior post date of accident number two. Who's Dr. Kranzler? Dr. Kranzler was employer's second independent medical examiner. Kranzler actually hurts their position, doesn't he? I believe he kills their position. And why is that? Well, because he agrees with the reasonableness and necessity of all the medical treatment Clayman has undergone to date, and he establishes causal connection. And that's their expert? That is their expert. He's the only medical expert they obtained following accident number two. And I believe that the fact that employer didn't start paying benefits after their own IME established causal connection, that was the proverbial nail in the coffin against employer here that indicates penalties are warranted. When did they first raise the rising out of defense? That was in the cross examination of petitioner at the arbitration hearing ten years after her date of accident. And that was the last basis upon which Justice Brennan thought respondents' behavior was mitigated here, not warranting penalties. She points to the fact that one of the commissioners dissented and brought up this arising out of defense. And in that regard, your honors, I would attest that the factual basis upon which that commissioner wrote that dissent is inaccurate. That commissioner indicates that this petitioner was exposed to no greater risk than the general public because she only changed or made two to three beds a day, when in fact that's not accurate. The testimony of petitioner was that she made two to three beds the day, the original day she got hurt before she was injured. The remainder of her testimony and the remainder of the facts in the medical evidence, as well as you look at Pat Savis' vocational assessment taken of this claimant, she did 10 to 13 beds a day, and at times she exceeded 100 beds per week, clearly a risk greater than the general public. And so on those three, the three bases that Justice Brennan relies to reverse the commission's award of penalties, I believe all three can be attacked. Who's Justice Brennan? Excuse me. Judge Brennan of the Circuit Court of Cook County. Okay. You elevated him. I'm sorry. No offense to her. She's judge. Pardon me, your honors. I thought this was some case you were quoting Justice Brennan from the Supreme Court or something. No, I apologize. Okay. I guess if I'm going to err, that's potentially a better error up rather than down. You put yourself a good step with her by erring, yes. As I'm attacking her opinion. But in summary, regarding Judge Brennan's opinion, she never establishes how the commission's decision awarding penalties and fees is against the manifest way to the evidence. And, therefore, her decision in that regard should be reversed by these justices. Thank you very much. Thank you, counsel. Counsel, you may respond. Good afternoon, justices, counsel. Elizabeth Coppoletti on behalf of the appellate cross appellant. Since these are cross appeals, I would like to reserve five minutes if I can of my time to step up again if that's all right. You have 15 minutes. Okay. You are going to address the idea of whether or not there was, it arose out of. Correct. Correct. I'll start with that. I believe that the commission's decision that this injury arose out of her employment is against the manifest way to the evidence and should be reversed. And that is because? That is because that when we look at risks, risks are, the rising out of component of risks are divided into three categories. We have employment. We have personal. And we have neutral. And the commission, in fact, identified this risk as a neutral risk. But then they didn't take the analysis in the right direction. Because once you've identified it as a neutral risk, there's got to be something about the employment which is qualitatively or quantitatively makes that risk higher for that person. How about the frequency of doing that? Wouldn't that make the risk higher? The frequency potentially could make the risk higher. Making a bed, you're going to argue to us, is something that the average person does. Correct. How do we know that? That the average person makes a bed? Right. Well, I think, actually, in the brief, we know, we talk about people going downstairs. Okay. I'll buy that. But, I mean, what's the data? Well, most people make beds. I mean, she would, I think. That the general public makes their bed. Yeah, exactly. That the general public does, in fact, make their bed. I mean, I think that that is a risk. How do we know that? But it's not even the making the bed. It's the bending over. So that's really what's going on here. She's bending over. Right? She's bending over at the time. And that's what she says. Her testimony is actually that her back was hurting throughout the day. It was hurting and hurting and hurting. It was getting worse throughout the day. Can't the commission find that even if it is a neutral risk, you know, even if we get over Justice Stewart's hurdle, that how do we take judicial notice that people make beds, people probably don't make beds 50 times a day, do they? Well, that's not the testimony, though. Her testimony was very clear. The only testimony in this record is that she made the beds approximately two or three. She actually wasn't sure how many beds she had made in that day. Did your apologies quote a much higher figure than that? That was what was provided by her, by the petitioner to Mr. Patsavas. But there's no testimony to that effect, that she was making that many beds. But making the bed is part of her job. Correct. Making the bed is part of her job. She's a maid. Absolutely. That's what she does for a living. And so you want to tell us that if she gets hurt doing her job, making the bed, sorry, other people make beds, so it's a neutral risk, she can't recover. I am saying that the risk is a neutral risk and that there has to be something about her employment that, in fact, increased that risk. What she was doing was bending over, and that's what led to her injury. I mean, her testimony was she was, like I said, she was bending over, picking up the end of a mattress and lifting it to make the bed. Well, that's, that exactly wasn't, I understand. But the testimony, and I am parsing out her testimony here. I appreciate that. But her testimony was that her back had hurt throughout the day. It was getting worse. And then as she bent over, she felt the stabbing pain and fell to the floor. And then she did say, upon further questioning, I think there was another question from counsel, was there something in particular you were doing? She said, I had, you know, my hand on the mattress. So I, and I appreciate I'm making a distinction here, but the testimony really was that throughout the day her back was hurting her and that she then bent over and felt the stabbing pain and she fell to the floor. So, yes, in my mind, that is a neutral risk that we all, you know, if I drop my glasses and bend over, that's what happened. And the fact that she does clean hotel rooms, I mean, I don't dispute that, but her testimony was that she only had two or three. And there's nothing that said that because of those, the fact that she had cleaned two or three hotel rooms in any way increased that risk at that moment when she bent over. I mean, I, that. I think we understand the argument. What about your argument to uphold the denial of the permanent total? The opposing counsel takes issue with Belmonte. There's a lack of evidence, credible evidence in the record to support the denial. What's your response to it? Well, first my response. Why should we uphold that decision? Uphold the decision. Well, first my response to that is I don't believe that they, they being the commission, applied the appropriate standard. In fact, Arbitrator Black that was then thusly adopted by the commission, he puts in there that the claimant met her burden by the prima facie, presenting prima facie evidence of a permanent total disability benefits. Well, that's not the standard. I mean, the standard is clear that you actually have to, by the preponderance of the evidence, show that they are, fall into the odd lot total, odd lot permanent total category. It's not just prima facie. There's a much higher showing than the prima facie. And the fact that the arbitrator stated that all they did was make a prima facie finding that then was rebutted by Mr. Belmonte's opinion that in fact she could, you know, access the market by having a GED, I think that itself shows that she never was able to meet her initial, initial burden of a preponderance of evidence because the arbitrator used the wrong standard and in using the wrong standard basically said the wrong standard was even rebutted. But you want us to uphold that decision, perhaps for different reasons in the record. Correct. Correct. And I think that then we get back down to manifest way of evidence. Did they look at, you know, both of the experts, Posadas and Belmonte, and the arbitrator even indicated they were both well-spoken and, you know, they both had differing opinions and weighing those opinions, he came up with the fact that she did not, she was not permanently totally disabled. And that's, you know, that's the commission's function to do so, is to weigh that evidence and come up with a decision relative to permanent total disability and they just felt it wasn't proved. It didn't present the appropriate evidence. Relative to the issue of penalties and fees. Relative to the penalties and fees. He raises some very good points. He does raise some points. I mean, I think it was, we have to look at objective reasonableness. Was it reasonable at the time for the respondent not to pay these benefits? And the first thing we have to look at is obviously the accident dispute, but also the histories that were being provided by the claimant in and around the time to the different medical providers. I think Dr. Schulter even says at one point in the medical records that she's a poor historian. We're unclear as to what happened. There's one where she's buffing in floors. I mean, clearly that's not it. We also had video surveillance in and around that time in 1999, showing her completely capable and able to function. She was washing her car. She was doing groceries. It certainly was reasonable for the respondent to think, hey, are we sure there was even an accident that occurred here? Well, why did you wait 10 years to assert that? Well, we don't know. We can't talk to the claimant. So the first, I mean, this isn't like, you know, in civil courts where we have discovery and we know what's going on. The first time, a lot of times the first time we ever hear the story is when the claimant is on the stand testifying at trial. I mean, that's a lot of times the first time we ever actually know what may or may not have transpired. Otherwise, it's just from medical records and what we may or may not know. She obviously wasn't employed by us anymore. There was never, you know, an incident report or anything. So the first time you ever hear the story is when she's on the stand. So that would be why. It would be the first time that we heard exactly what transpired. What about the timely explanation for the denial of benefits? What's your response to that? Relative to I don't know in the record whether or not there is actually a letter that was put in the record. So I can't tell you that. I mean, I don't see that letter in the record. I do know that there was a response by the respondent to the petition for penalties that was put into the record. But it was objective. I mean, so we have to go back to say was it objectively reasonable for the employer to say, hey, we don't owe this woman benefits. And I think looking at everything, looking at the histories, the confused histories, and the fact that we had the video surveillance and the fact that when she went back to the doctor in Cook County, she started treating for L5S1, which was never implicated when she first went to the Dr. Slack and Dr. Matz after the first two injuries. In fact, she was treating for L2, L3 level. So then we have, you know, we have video surveillance. We have a delay in treatment. And then she has surgery at the L5S1 level. I think it would be reasonable for the respondent then to question does this really have anything to do with these first accidents. Who was Dr. Pranzer? Dr. Pranzer was a physician that did evaluate the claimant. On behalf of the respondent. On behalf of the respondent. That is correct. And what did he say? Dr. Pranzer did provide a causal relationship opinion tying up the accidents to the needed treatments. And there's no question that he did that. And so then what did you do? Based on the record, I believe that we continued to dispute the claim. But your own doctor said there was a causal connection. Well, I don't think that that becomes, I mean, I'm not bound by what that doctor says. I mean, he's not. I can choose to use it or not use that report. But I appreciate that that's what Dr. Pranzer said. But that still doesn't obviate the accident defense, which is what the commissioner in dissenting saying, look, this isn't, you know, we shouldn't be awarding this. There's no accident. I think it's reasonable then for the respondent to dispute payment of liability. I mean, the purpose of the penalties is not to keep employers from not asserting reasonable defenses. I mean, and it certainly was reasonable to question accident, as found by one dissenting commissioner. I mean, he certainly thought it was reasonable. So if a dissenting commissioner thought it would be reasonable, why wouldn't it be reasonable for the employer to also feel that that was a valid defense? I mean, it was. So that should be the rule we announced, that if a dissenting commissioner thinks it's in dispute, then there should be no penalties? Well, that would be, I would like that rule. I'm not sure you're going to be inclined to do that for me. But I do think that it does show an objective measure of reasonableness if one dissenting commissioner certainly finds that there shouldn't have been an accident. I mean, I think it goes to the question of reasonableness. Last night, I just want to point out just briefly, relative to, you know, assuming that you find accident and that you affirm the award. You don't want to assume that we'll do anything. Right. Permanent partial disability. I believe that the law is clear that there should only be one award. The commission erred in writing two separate and distinct awards, one of 20 percent and one of 40 percent. I think City of Chicago was pretty clear in the sense that if there are two separate accidents and there's one indivisible condition of ill-being, then you only have one award. And that's exactly what happened here. I mean, that's, even Dr. Kranzler says it was an amalgamy of both of those two accidents, which eventually led to her indivisible one condition of ill-being. And given that, there's no way to separate these two accidents, to apportion them, saying 20 of a man, 40 of a man. It's, in fact, just one condition of ill-being. And therefore, I would ask that the 20 percent loss of the prison home be vacated, because under City of Chicago, they're not indivisible and there's only one award as appropriate. Thank you. Thank you, Counsel. Counsel, you may reply. Thank you, Your Honors. Briefly, as to the penalty issue, once again, a counsel makes very passionate arguments about the reasonableness of their behavior. But once again, I think we need to look at that behavior in context of time. The commission rule that requires employers to provide written explanation for denial of benefits within days is there for a reason. It's so that injured workers know that their claim is being disputed and the basis for the denial. To sit back and cherry pick what your defense is going to be in the middle of the hearing is not a reasonable basis to withhold benefits. And secondly, as to the last issue, as to the two PPD awards, of course, I'm resting on my argument in brief regarding seeking the total permanent disability. But very briefly, I believe this case is distinguishable for City of Chicago in that Justice Holdren's, in your opinion, has indicated that we need to be able to delineate a separate condition of ill-being for each accident. And here, I believe respondent's own IMEs have done a beautiful job for me in that regard. After accident one, we have Dr. Metz who finds a benign neuromuscular exam, no herniations at L2, 3, or 4, no significant back derangement. Whereas, after accident number two, Dr. Kranzler diagnoses lumbar radiculopathy, or finds that the surgeries to L2 and 3 and L4 are not significant. And so, he finds that surgeries to L5, S1 were appropriate, and he classifies the herniations at the various levels, including L5, S1, which was never mentioned in the first accident, to be herniations with severe stenosis at L3, 4, and L4, 5. Additionally, I would point out the fact that, unlike City of Chicago, where worker, after accident one, really had no return to work full duty and had no indication that they were going to be able to go back to work, there were no indications of any permanency from the first accident. Here, we had an FCE done, and permanent restrictions were imposed. Dr. Metz disagreed with those restrictions, and that's why Klayman went back to work and attempted to work full duty, ultimately suffering her second accident. So, I believe this case is distinguishable from City of Chicago in that regard. Thank you. Thank you. Thank you.